# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

YURI SMITH,                              )
                                         )
                    Plaintiff,           )
                                         )
            v.                           )        Case No. 1:19-cv-04648-TWP-DML
                                         )
KINDEZI ACADEMY, LLC,                    )
                                         )
                    Defendant.           )

## ENTRY ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

This matter is before the Court on a Motion for Summary Judgment filed pursuant to Federal Rule of Civil Procedure 56 by Defendant Kindezi Academy, LLC (the "School") (Filing No. 27). Plaintiff Yuri Smith ("Mr. Smith") initiated this action after the School terminated his employment, alleging violations of the Americans with Disabilities Act ("ADA"), the Family and Medical Leave Act ("FMLA"), Title VII of the Civil Rights Act of 1964 ("Title VII"), and workers compensation provisions of various Indiana Code sections (Filing No. 1 at 2–4). The School later moved for summary judgment, arguing that (1) Mr. Smith's employment was terminated "because the School held a genuine belief that Mr. Smith was demonstrating poor job performance," (2) "Mr. Smith is not a qualified individual with a disability" and "he did not request any reasonable accommodations and any limitations Mr. Smith desired were readily available and not restricted by the School," and (3) "procedural defects bar Mr. Smith's claims of Title VII retaliation and Workers Compensation retaliation." (Filing No. 28 at 13). For the following reasons, the Court **grants** the School's Motion.

## I.      BACKGROUND

The School was opened by the Neighborhood Charter Network ("NCN") as an Innovation Network school within Indianapolis Public Schools in 2016 (Filing No. 29-14 at 1). Since its

founding, the School, which now serves students in kindergarten through sixth grade, has been led by Shanae Andrews ("Ms. Andrews"), who reports to NCN Executive Director Kevin Kubacki ("Mr. Kubacki") (Filing No. 29-14 at 1; Filing No. 29-8 at 6). In October 2017, Mr. Smith was hired as the School's "Assistant Dean of Culture," reporting directly to Ms. Andrews. (Filing No. 29-2 at 26–27, 38.) The next school year, however, the School eliminated this position and transferred Mr. Smith to an "Instructional Coach" role for fifth and sixth grade teachers. *Id.* at 43, 44–45, 67. Mr. Smith was paid $63,000.00 annually in his new job, up from the $60,000.00 salary he received as Assistant Dean of Culture (Filing No. 29-8 at 127).

In this capacity, Mr. Smith still reported to Ms. Andrews, but was now charged with "supporting the instructional and cultural development of all teachers, providing direction and guidance for data analysis and action planning, and providing the resources and supports necessary to build collaborative, productive relationships." (Filing No. 29-4 at 1.) Specifically, Instructional Coaches were expected to

(1) "build teacher capacity and their understanding of instructional practices, Indiana Academic Standards, school selected curriculum, and data driven instruction";

(2) "[m]odel[ ] continuous improvement, lifelong learning, and go[] above and beyond to ensure student success";

(3) "work collaboratively as a team with members of the Instructional Leadership Team";

(4) "promote reflection, provide guidance and structure where needed, and focus on strengths, collaboration, and growth";

(5) "ensur[e] high-quality instruction in classrooms through modeling, co-planning, co-teaching and providing feedback to teachers"; and

(6) "demonstrate and model a passion for urban education reform and leadership."

(Filing No. 29-4 at 1). And relevant here, as part of their "essential job functions," Instructional

Coaches were required to

(1)     "Model lessons in classrooms on a daily/weekly basis";

(2)     "Support the instructional development of all teachers in understanding the Indiana Academic Standards, curriculum, assessments, and data analysis";

(3)     "Provide direction and coordination for how the curriculum is taught consistent with school initiatives and recognized best instructional practices";

(4)     "Support teachers and administrators in using data to improve instruction on all levels";

(5)     "Assist teachers with planning and pacing of lessons, the development of differentiated lessons, and the selection of best practices to meet the needs of their students";

(6)     "Support teachers by helping with the -strategic how of teaching -- share multiple instructional strategies/processes with teachers during planning times";

(7)     "Develop coaching plans for teachers to ensure student improvement."

*Id.* Consequently, content expertise in both the Indiana Academic Standards and the curriculum

programs employed by the School was key to the role (Filing No. 29-2 at 84–85).

In addition to Mr. Smith, the School employed two other Instructional Coaches supervised

by Ms. Andrews: Renee Wilson ("Ms. Wilson") and Toya Downs ("Ms. Downs") (Filing No. 29-

8 at 17, 122). Ms. Wilson started in her role of Instructional Coach to kindergarten, first grade, and

second grade instructors at the same time as Mr. Smith, Fall 2018. *Id.* at 32. For her part, Ms.

Wilson was paid a salary of $70,000.00. *Id.* at 126. In this position, Ms. Wilson at times struggled

with communicating with teachers she coached because she had difficulty perceiving why they

might not put in the same level of effort in planning as she had as a teacher (Filing No. 29-9 at 58–

59). As a result, Ms. Andrews at one point coached her in how to better obtain results through

teachers. *Id.* Specifically, one teacher felt that Ms. Wilson was "demeaning" to her, but further

investigation by Ms. Andrews revealed that the teacher was indeed underperforming, and the teacher eventually resigned before she was terminated (Filing No. 29-8 at 91). Moreover, Ms. Andrews sent emails to Ms. Wilson requesting that she submit then-late plans and directing her to use more precise language in establishing action steps for teachers. *Id.* at 91–93; Filing No. 34-19; Filing No. 34-20. Generally, feedback from teachers on Ms. Wilson's leadership reflected negatively on her relationships with instructors, but also signaled that she did provide helpful resources and coaching (Filing No. 34-10 at 1–9). In her time as Instructional Coach, Ms. Wilson never requested FMLA leave (Filing No. 34-1 at 15).

Ms. Downs started working as an Instructional Coach for third and fourth grade teachers in July 2018, annually earning $65,000.00 (Filing No. 29-8 at 31; Filing No. 34-17 at 1). Like Ms. Wilson, Ms. Downs at times strained to effectively coach teachers, specifically in promoting growth after she identified gaps in instruction and pedagogy (Filing No. 29-8 at 63–64). In fact, Ms. Andrews met with Ms. Downs within the first month of her employment to discuss feedback she gave teachers (Filing No. 34-17 at 2). At one point, a teacher filed a complaint with Human Resources ("HR") about Ms. Downs, which eventually led to that teacher being removed from Ms. Downs' roster and placed with Mr. Smith (Filing No. 29-8 at 89–90). In another instance, Ms. Andrews facilitated a discussion with another teacher of Ms. Downs' due to a breakdown in communication. *Id.* at 96–98. Throughout her time coaching, Ms. Downs' teachers would at times fail to timely upload their lesson plans, and Ms. Andrews would, consistent with normal practice, provide Ms. Downs feedback on action steps she provided her teachers (Filing No. 34-17 at 1–2). On December 18, 2018, Ms. Andrews, after reviewing assessment data, informed Ms. Downs that some teachers would need targeted assistance plans due to poor performance of students (Filing No. 34-11). A few months later, on February 14, 2019, Ms. Andrews trained Ms. Downs on

4

effectively planning and rehearsing with instructors and provided her feedback on teacher packets (Filing No. 34-18 at 11). A few weeks later, on February 27, 2019, Ms. Andrews listed one of her "biggest challenges" for the week as "[Ms. Downs'] coaching" and included several follow-up items to address her concerns. *Id.* at 7. Approximately a month later, on March 20, 2019, Ms. Andrews brought up moving to a teaching position to Ms. Downs because she was not a "proficient coach." *Id.* at 6. Indeed, later that spring, Ms. Downs was moved to a teaching position (Filing No. 29-9 at 64), but was informed on May 31, 2019, that the School was not renewing her Memorandum of Understanding for the following school year because she failed to meet performance expectations: she did not model strong classroom culture and did not implement strong classroom routines (Filing No. 34-7 at 1). Finally, like Ms. Wilson, Ms. Downs also did not request FMLA leave while an Instructional Coach (Filing No. 34-17 at 1).

Mr. Smith, for his part, received regular training and professional development as an Instructional Coach, including a seminar on educational standards in Los Angeles, California, training sessions on instructional coaching with outside organizations, NCN's selective leadership development training, an NCN instructional coaches "boot camp," and one-on-one coaching. *Id.* at 60–61, 86–87; Filing No. 34-5 at 1. Additionally, for a short span at the start of the 2018 fall semester, Mr. Smith took over a math class after a teacher's employment was terminated (Filing No. 29-8 at 56–57). Generally, teachers reported no problems with Mr. Smith, and nothing stood out to Ms. Andrews as negative in instructor surveys of his leadership (Filing No. 29-8 at 22). But despite this training and experience, Ms. Andrews and Mr. Kubacki, along with outside trainers, felt that (and orally and electronically informed Mr. Smith that) due to a lack of content area knowledge Mr. Smith persistently struggled in identifying teacher shortcomings and coaching them on improving their instruction and student outcomes (Filing No. 29-8 at 50, 59, 72, 79, 102–

04; Filing No. 29-9 at 34–35; Filing No. 34-5 at 1–2). In fact, because of a lack of progression in content knowledge, many of Mr. Smith's responsibilities were taken over by Ms. Andrews and Mr. Kubacki starting on December 21, 2018, with Mr. Smith no longer providing direct instructional coaching to teachers from that point forward (Filing No. 29-11 at 4–5). Mr. Smith, however, was never placed on a performance improvement plan (Filing No. 29-8 at 49).

Meanwhile, sometime in the Fall 2018, Mr. Smith injured his back when he slipped and fell on stairs while escorting a student following a behavioral incident (Filing No. 29-2 at 128–29). Mr. Smith did not file an injury report with the School and instead noted it in the student's discipline write-up and visited the school nurse. *Id.* at 132–34, 135-36. Because of this fall, Mr. Smith has suffered intermittent back pain, which he feels sporadically to this day. *Id.* at 138. As a result, Mr. Smith visited a chiropractor around the time of the incident and took part in physical therapy after seeing a sports medicine doctor. *Id.* at 136–37. Later, Mr. Smith was forced to seek immediate care due to the "excruciating" pain, where he received an injection and muscle relaxers. *Id.* at 140, 141–42. Soon after, Mr. Smith went to HR Manager Brittney McCollum ("Ms. McCollum") about his injury, requesting information about workers compensation in January 2019, *id.* at 143–44, despite the School's workers compensation policy requiring an injured employee to file a report of the incident "immediately." (Filing No. 29-5 at 10.) After providing Ms. McCollum the discipline write-up (but no other documentation), Mr. Smith was informed how to file for workers compensation, but he never completed this task, and no one from the School ever told him that they did not want him to receive this benefit (Filing No. 29-2 at 145–46, 170). Moreover, though he intended to request accommodations (for less walking up and down stairs and restricted carrying and lifting) in an "official capacity," Mr. Smith merely self-limited his physical exertions (which his teacher team knew) and always had access to use of an elevator. *Id.*

6

at 147–49. The School's disability accommodation policy, however, required employees to directly request accommodations from their supervisors (Filing No. 29-5 at 17). Despite its persistence, Mr. Smith is not currently seeing a doctor for his back pain (that sometimes even makes it hard for him to get out of bed) and never had work restrictions placed on him when he worked at the School due to the injury (Filing No. 29-2 at 139, 150).

During this same January meeting with Ms. McCollum concerning workers compensation, Mr. Smith informed her that his wife was expecting a child later that spring. *Id.* at 121. Ms. McCollum provided Mr. Smith with information concerning various leave policies and told him to follow-up as the due date neared. *Id.*; Filing No. 34-1 at 11. For its part, the School's policy for FMLA leave required requests to be made "in writing," with the reason for the request, the potential duration, and the anticipated start date included in the written request (Filing No. 29-5 at 11). At no time was Mr. Smith given any indication that he would not be permitted to take leave following the birth of his child (Filing No. 29-2 at 152). Moreover, at some point, Mr. Smith contends that he informed Ms. Andrews that he believed she was treating him differently than Ms. Wilson and Ms. Downs (the other Instructional Coaches) due to his gender (Filing No. 29-2 at 178), but Mr. Smith never complained to HR about this belief (Filing No. 34-1 at 55). The School's policy on discrimination complaints, however, required employees suspecting discrimination to "immediately report the incident to Human Resources or their School Leader," which "may be done in person, in writing, or by telephone." (Filing No. 29-5 at 19.)

By January 31, 2019, after continued stagnancy in his professional development, Ms. Andrews determined Mr. Smith's lack of progression was unworkable and decided to terminate his employment. Though Ms. Andrews conferred with Mr. Kubacki and Ms. McCollum about the termination and its potential ramifications, the termination decision was Ms. Andrews' alone.

Filing No. 29-10 at 3, 9–10. Ultimately, Mr. Smith was terminated by letter presented to him by

Ms. Andrews and Ms. McCollum on February 4, 2019:

> Your employment is terminated due to the inability to effectively perform your
> essential job functions; leading content and culture. We have provided ongoing
> feedback, resources and a number of training initiatives in an attempt to develop
> you in these areas, but unfortunately there has been no progress over the course of
> the semester. At this time, we will take the best course of action to provide the
> appropriate support that is needed for instruction and development in our
> classrooms.

(Filing No. 29-6 at 1.) Ms. Andrews maintains that Mr. Smith's injury and his wife's pregnancy

had nothing to do with his termination (Filing No. 29-8 at 139–40). Indeed, Ms. Andrews did not

know that Mr. Smith intended to take any leave at the time she terminated his employment. *Id.* at

139. Following his termination, Mr. Smith obtained a letter of recommendation from Ms.

McCollum, stating

> I have known Yuri Smith for quite some time during my capacity as a Human
> Resources Professional. During this time, Yuri has proven to be a hard working,
> passionate and dedicated individual who possesses the will to learn new skills and
> techniques that develops him personally and professionally. He has proven his
> ability to foster productive relationships, motivate teams and positively impact our
> culture. Yuri often expressed interest and took initiatives toward professional
> development that will advance his expertise in instruction, which will enhance his
> ability to coach and develop the content and curriculum in other instructors. Yuri
> is a combination of ambitious, humble, and emotionally intelligent. I believe that
> with these qualities, one can defeat any obstacle that they are faced with. Yuri is an
> inspiration to all, and is someone who you would be proud to have in your
> environment!

(Filing No. 34-8 at 1.)

> A few months later, on or around April 17, 2019, Mr. Smith filed an EEOC Charge, stating
>
> I am an African American male. In 2017, began working at Kindezi Academy as
> the Assistant Dean of Culture. In 2018, I became an instructional coach. I
> performed my job well.
>
> At the end of January 2019, I informed HR that I was hurt on the job and that I
> needed some information on workers compensation. In addition, I informed HR
> and that I needed to take time off because my wife was having a cesarean procedure
> and HR informed me that I only need to inform the principle when my wife

delivered. On Feb 4, 2019, I was terminated for allegedly failing to perform the essential functions of my job; leading content and culture. However, I was never told prior to the termination that I was not leading content. In fact, I was told by the principle that she did not need to meet with me about my performance consistently because I was doing so well. I was asked to take over two classrooms for a minimum of two weeks. I created testing opportunities for all testing subjects relating to grade fifth and sixth grades; none of the women instructional coaches were asked to do that. I gathered all data and none of the women had to do that either, their data was provided for them. In addition, my culture data was exemplary. However, there were two women serving as Instructional coaches who people complained about to HR and an investigation was conducted and both women had poor culture data, but neither women were terminated.

I believe I was terminated due to my sex and disability in violation of Title VII and Americans with Disability Act. I believe I was terminated because I engaged in protected activity in violation of the Americans with Disability Act.

([Filing No. 40-1 at 1](#) ([sic] throughout); [Filing No. 29-13 at 2](#)). Nevertheless, Mr. Smith never sent the School a Tort Claim Notice and did not notify the School in writing of any purported violation of law and proposed remedy (*see* [Filing No. 29-13 at 1](#), 2). Eventually, Mr. Smith initiated this action (*see* [Filing No. 1](#)), with the School later moving for summary judgment pursuant to Federal Rule of Civil Procedure 56 ([Filing No. 27](#)).

## II.  LEGAL STANDARD

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 489–90 (7th Cir. 2007). In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Zerante*, 555 F.3d at 584 (citation omitted).

"However, inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *Dorsey v. Morgan Stanley*, 507 F.3d 624, 627 (7th Cir. 2007) (citation and quotation marks omitted). Additionally, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490 (citation omitted). "The opposing party cannot meet this burden with conclusory statements or speculation but only with appropriate citations to relevant admissible evidence." *Sink v. Knox County Hosp.*, 900 F. Supp. 1065, 1072 (S.D. Ind. 1995) (citations omitted).

"In much the same way that a court is not required to scour the record in search of evidence to defeat a motion for summary judgment, nor is it permitted to conduct a paper trial on the merits of [the] claim." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001) (citations and quotation marks omitted). "[N]either the mere existence of some alleged factual dispute between the parties nor the existence of some metaphysical doubt as to the material facts is sufficient to defeat a motion for summary judgment." *Chiaramonte v. Fashion Bed Grp., Inc.*, 129 F.3d 391, 395 (7th Cir. 1997) (citations and quotation marks omitted).

### III.   DISCUSSION

The School contends that all of Mr. Smith's claims fail. The Court will address each contention in turn.

### A.   ADA disability claims

Mr. Smith's Complaint lists three claims against the School that fall under the ADA: for discrimination, for failure to accommodate, and for retaliation (*see* Filing No. 1 at 3). To receive protection from the ADA, a plaintiff must demonstrate that he is a qualified individual with a disability. *Lacy v. Cook Cty., Illinois*, 897 F.3d 847, 853 (7th Cir. 2018). Under the ADA, a plaintiff is a qualified individual with a disability if a physical impairment "substantially limits one or more

major life activities." 42 U.S.C. § 12102(1)(A). In determining whether an individual's major life activities are substantially limited, a court should consider the condition, manner and duration of the individual's ability to perform a major life activity, including consideration of difficulty, effort, or time required, pain experienced, the length of time activity can be performed and the way the impairment affects the operation of major bodily functions. 29 C.F.R. § 1630.2(j)(4)(i)-(iii).

The School argues that Mr. Smith is not a qualified individual with a disability because his back pain did not substantially limit his ability to perform any major life activity (*see* Filing No. 28 at 14–16 (citing *Holman v. Triplett*, 2020 WL 5570039, at *9 (N.D. Ill. Sept. 17, 2020); *Chimis v. Peoples Gas Light & Coke Co.*, 2018 WL 3619370, at *4 (N.D. Ill. July 30, 2018); Filing No. 39 at 7–8 (citing *Smith v. Concentra, Inc.*, 240 F. Supp. 3d 778, 786 (N.D. Ill. 2017))). Mr. Smith, however, responds that he was indeed qualified under the ADA since his "major life activity of lifting and walking were substantially limited due to his" back injury (Filing No. 33 at 25–26).

Here, considering the factors contemplated by the ADA and its implementing regulations, the Court agrees with the School: Mr. Smith was not, at least at the time of his termination, a qualified individual with a disability. *See Bay v. Cassens Transp. Co.*, 212 F.3d 969, 974 (7th Cir. 2000) ("Whether or not an individual meets the definition of a qualified individual with a disability is to be determined as of the time the employment decision was made.") (citation omitted). While courts generally find walking to constitute a major life activity, "a limitation on the ability to walk must be permanent or long term, and considerable compared to the walking most people do in their daily lives." *Fredricksen v. United Parcel Serv., Co.*, 581 F.3d 516, 522 (7th Cir. 2009) (quotation omitted). In fact, in *Fredricksen*, the Seventh Circuit affirmed a district court's grant of summary judgment on a plaintiff's walking-based disability discrimination claim when

> at all times he was able to perform the essential functions of his job as an aircraft
> mechanic (which include walking, standing, bending, stooping, climbing, and

crawling for the duration of an 8– or 10–hour workday), that he never missed work because of difficulty walking, that he never sought any type of assistive device or other treatment for the problem, and that no physician had ever directed him to restrict his walking.

*Id.* at 521; *see also Holman*, 2020 WL 5570039, at *9 ("Plaintiff's deposition testimony reflects that after his injury, he maintained the ability to walk up and down stairs, as well to climb up and down from his bunk, even while he experienced pain and some difficulty."); *Chimis*, 2018 WL 3619370, at *4 ("Chimis visited the doctor during his employment because of his knee pain, and the tests revealed severe medial joint space loss, osteophytes and sclerosis, and severe osteoarthritis. But Chimis does not allege facts about, or otherwise elaborate on, how these problems impacted his daily life. And though it may have been painful, the record indicates that Chimis was able to perform his job, which required stooping, bending, and kneeling.") (citation omitted); *Smith*, 240 F. Supp. 3d at 786 ("Smith's wrist was injured, [ ] she was required to wear a wrist brace, and [ ] she was unable to use it for writing or unscrewing specimen caps. [And] Smith complained of pain in her left wrist that was exacerbated by standing, having her hand at her side, twisting, and making turns while driving, and [ ] she sought therapy for these symptoms. None of these impairments, however, rise to the level of interfering with a major life activity.").

Same here: Mr. Smith has not contended that his back injury impaired his ability to perform any essential functions of his job, that his injury caused him to miss work, that he requested or received any tools to help him perform tasks because of his injury, or that, by the time of his termination, he had been directed by medical professionals to limit any physical activity due to the injury. *Cf. EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 802 (7th Cir. 2005) (finding that genuine issues of material fact existed over whether the plaintiff's neuropathy substantially limited her ability to walk, because the record contained evidence she: (1) could not walk one city block without losing sensation in her right leg and both feet; (2) walked with a cane and had to balance

against a wall to avoid falling; and (2) was under a doctor's recommendation to avoid excessive walking). Because Mr. Smith was not a qualified individual with a disability under the statute at the time of his termination, the Court **grants** the School's Motion as to his three ADA claims.

**B.      Title VII sex discrimination claim**

Mr. Smith's Complaint alleges that the School terminated him because of his sex, discriminating against him in violation Title VII (Filing No. 1 at 4). "In discrimination cases, '[w]hen a defendant moves for summary judgment, the singular question for the district court is whether the plaintiff has introduced evidence that would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action.'" *Igasaki v. Illinois Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 957 (7th Cir. 2021) (citing *Purtue v. Wisconsin Dep't of Corr.*, 963 F.3d 598, 602 (7th Cir.), *reh'g denied* (July 31, 2020)).

"One way of proving employment discrimination under Title VII remains the burden-shifting framework of *McDonnell Douglas v. Green*, 411 U.S. 792 . . . (1973)," which "requires a plaintiff to make a prima facie case of discrimination"—that is, that "(1) he belongs to a protected class; (2) he met his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) another similarly situated employee outside of his protected class received better treatment from his employer." *Id.* (citing *Marshall v. Indiana Dep't of Correction*, 973 F.3d 789, 791–92 (7th Cir. 2020)). A male plaintiff alleging gender discrimination, however, "must show background circumstances that demonstrate that a particular employer has reason or inclination to discriminate invidiously against [males] or evidence that there is something fishy about the facts at hand." *Phelan v. City of Chicago*, 347 F.3d 679, 684 (7th Cir. 2003). Once this prima facie case is made, "'the burden shifts to the employer to offer a nondiscriminatory motive, and, if the

employer does so, the burden shifts back to the plaintiff to show that the employer's stated reason was a pretext.'" *Id.* (quoting *Purtue*, 963 F.3d at 601–02).[1]

The School insists that Mr. Smith was not terminated due to his sex; rather, he was let go because he "was not meeting the legitimate expectations of the School, . . . and the School had a legitimate, non-discriminatory reason to terminate his employment. There is nothing fishy about that." (Filing No. 28 at 23.) And though he attempts to compare himself to Ms. Wilson and Ms. Downs, these individuals were not similarly situated to Mr. Smith because Ms. Wilson was meeting legitimate expectations and Ms. Downs suffered from different concerns, but, nevertheless, was ultimately released from her employment, like Mr. Smith. *Id.* at 23, 19–20.

Mr. Smith responds that background circumstances are "fishy" because he was paid less than his female Instructional Coach peers: "Mr. Smith was paid an annual salary of $63,000.00. Ms. Wilson was paid an annual salary of $70,000.00. Downs was paid an annual salary of $65,000.00." (Filing No. 33 at 19.)   Additionally, Mr. Smith was meeting the School's expectations, evidenced by Ms. Andrews telling him "that he was doing a good job" and Ms. McCollum writing him a "glowing recommendation letter." *Id.* Further, evidence demonstrates that Ms. Wilson and Ms. Downs were treated more favorably than Mr. Smith (and that the School's claimed grounds for termination were pretextual) when these women "had similar [ ] and more performance deficiencies, but Wilson was never terminated and Downs was provided another opportunity to succeed in a new position." *Id.* at 20–22.

---

[1] To be sure, "a plaintiff need not use the *McDonnell Douglas* framework after *Ortiz* [*v. Werner Enters., Inc.*, 834 F.3d 760 (7th Cir. 2016)]," which instructs that "[t]he determinative question in discrimination cases is 'whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action.'" *Igasaki*, 988 F.3d at 957–58 (citing *Ortiz*, 834 F.3d at 765). But here, the parties argue the case under *McDonnell Douglas*, and the Court will analyze it the same. That said, the Court finds that a holistic view of the evidence under *Ortiz* would also not permit a reasonable factfinder to conclude that Mr. Smith's sex caused his termination.

The School replies that no "fishy" circumstances exist concerning salary paid when "Ms. Wilson negotiated her salary when she was hired," and "Ms. Downs also negotiated her salary and the School compromised with her." (Filing No. 39 at 14.) On the other hand, "Mr. Smith was an internal hire into the Instructional Coach position and he received an increased salary from $60,000 in his prior position to $63,000 for the Instructional Coach position." *Id.* In short, no evidence suggests that these differences in pay "were caused by anything other than non-discriminatory reasons – negotiations by the new hires and experience levels." *Id.* In a surreply rejoinder to this contention, Mr. Smith contends that he too attempted to negotiate his salary, but was rebuffed "because the salary was competitive with what other districts paid their instructional coaches." (Filing No. 43 at 2.)

The Court agrees with the School that Mr. Smith has failed to show the requisite additional suspicious circumstances required when a "majority" plaintiff alleges discrimination. *See Mills v. Health Care Serv. Corp.*, 171 F.3d 450, 456–57 (7th Cir. 1999). True, Ms. Wilson and Ms. Downs were paid more than Mr. Smith. But Mr. Smith has not sufficiently countered the School's argument that different circumstances animated pay considerations for these Instructional Coaches, even if he did attempt to negotiate his own salary.  Outside hires have different power at the bargaining table than internal transfers, and Mr. Smith's leverage was especially limited considering his prior position as Assistant Dean of Culture had been eliminated.  Mr. Smith has not pointed to any other suitors for his employment that would incentivize the School to pay him more than the ultimately agreed-upon salary. Moreover, Mr. Smith has pointed to no evidence undermining the contention that different skill and experience levels would lead to higher salaries for Ms. Downs and Ms. Wilson. Because Mr. Smith has failed to carry his initial burden of

demonstrating "fishy" circumstances around his discrimination claim as a man, the Court **grants** the School's Motion as to his Title VII discrimination claim.

## C.   <u>FMLA interference claim</u>

Mr. Smith's Complaint alleges that the School interfered with his FMLA rights in violation of that statute (Filing No. 1 at 3). To establish a claim for FMLA interference, a plaintiff must prove (1) he was eligible for FMLA, (2) the defendant was covered by FMLA, (3) he was entitled to leave under FMLA, (4) he provided sufficient notice of his intent to take leave, and (5) the defendant denied him benefits to which he was entitled. *Riley v. City of Kokomo*, 909 F.3d 182, 188 (7th Cir. 2018).

The School maintains that though "Mr. Smith anticipated taking leave for newborn care and bonding in late March or early April 2019," he "was not yet eligible" for that leave on February 4, 2019, when he was terminated "due to poor job performance." (Filing No. 28 at 25.) In fact, the School continues, Mr. Smith admits that "no one indicated to him any dissatisfaction or other issue with taking leave." *Id.* (citation omitted). In response, Mr. Smith argues that "FMLA protects the 'attempt' to exercise a right, which can only mean (in contrast with the actual exercise of that right) that the FMLA protects an employee who asks for leave even though he may not be eligible." (Filing No. 33 at 17–18 (citing 29 U.S.C. § 2615(a)(1); *Reynolds v. Inter-Indus. Conference on Auto Collision Repair*, 594 F. Supp. 2d 925, 928–29 (N.D. Ill. 2009), *as amended* (Jan. 22, 2009)).) Here, he contends, "Mr. Smith attempted to exercise his right to FMLA when he requested leave for the birth of his child." *Id.* at 18. The School replies, though, that "Mr. Smith was never denied FMLA leave. His employment terminated before the time that the qualifying need for leave was to arise, but the mere fact that his employment was terminated does not constitute interference." (Filing No. 39 at 9.) In fact, the School continues, "an employer may terminate the employment of

16

an employee if it would have been terminated regardless of the request for leave." *Id.* (citing *Pagel v. TIN Inc.*, 695 F.3d 622, 629 (7th Cir. 2012)).

The Court again agrees with the School. Even if a plaintiff establishes that he was entitled to the benefits he claims, an employer "may present evidence to show that the employee would not have been entitled to his position even if he had not taken leave." *Cracco v. Vitran Express, Inc.*, 559 F.3d 625, 636 (7th Cir. 2009). In other words, "employers may fire employees for poor performance if they would have fired them for their performance regardless of their having taken leave." *Ogborn v. United Food & Commercial Workers Union, Local No. 881*, 305 F.3d 763, 768 (7th Cir. 2002). Here, the evidence was Mr. Smith's to rebut that he would not have been terminated had he not requested FMLA leave. *See Pagel*, 695 F.3d at 629 ("To survive summary judgment, Pagel must overcome any such evidence offered by TIN."). But the only "evidence" of FMLA interference Mr. Smith musters is that he was terminated a few days after inquiring about parental leave policies. As the School notes, however, "mere temporal proximity is not enough to establish a genuine issue of material fact" as to FMLA claims. *Riley*, 909 F.3d at 188 (7th Cir. 2018) (quotations omitted). Indeed, Mr. Smith contradicts his theory by conceding that no one at the School seemed to take issue with his leave request, undermining that the School interfered with his entitlement to exercise his FMLA rights. Because Mr. Smith has not overcome the evidence offered by the School decisively refuting to his argument, *see Pagel*, 695 F.3d at 629, the Court **grants** the School's Motion as to his FMLA interference claim.

**D.**     <u>**Retaliation claims under the ADA, FMLA, and Title VII**</u>

Mr. Smith's Complaint alleges the School retaliated against him in violation of the ADA, the FMLA, and Title VII (Filing No. 1 at 3). To establish a claim for retaliation under each of these statutes, a plaintiff must show that (1) he engaged in statutorily protected activity, (2) he suffered an adverse action, and (3) a causal link between the two. *Pierri v. Medline Indus., Inc.*, 970 F.3d

803, 808 (7th Cir. 2020) (ADA); *Guzman v. Brown Cty.*, 884 F.3d 633, 640 (7th Cir. 2018) (FMLA); *Marshall v. Indiana Dep't of Correction*, 973 F.3d 789, 793 (7th Cir. 2020) (Title VII).

The School contends that Mr. Smith did not engage in a protected activity: "He did not request a reasonable accommodation," "it is unclear what Mr. Smith alleges was Title VII statutorily protected activity," and, the closest call is perhaps is his "indicating that he intended to take leave two months in the future," yet Ms. Andrews—the ultimate termination decisionmaker— "was not even aware" of this statement (Filing No. 28 at 26). In any event, the School continues, "there is no evidence that the School terminated Mr. Smith's employment in retaliation for engaging any statutorily protected activity," and "there is no evidence of pretext or any other indication of any improper motive behind the termination." *Id.* Finally, specifically as to the Title VII retaliation claim, Mr. Smith's EEOC Charge made "no allegation that he engaged in activity protected by Title VII and only asserted that he was retaliated against for engaging in activity protected by the ADA." *Id.* at 28.

Mr. Smith responds only to the FMLA retaliation argument, contending that he "engaged in statutorily protected activity" when he approached Ms. McCollum "and requested leave for the birth of his child." (Filing No. 33 at 15.) Moreover, this protected activity was causally connected to his termination, Mr. Smith maintains, because (1) of "suspicious timing" ("The decision to terminate Mr. Smith was made two days after he requested leave."), (2) the School's "reason for termination has no basis in fact" (Ms. "McCollum provided Mr. Smith with a glowing recommendation letter"), (3) the School's "reasons for termination cannot be the real reason" (Ms. Downs and Ms. Wilson had similar performance issues but received better treatment), and (4) "Mr. Smith's alleged misconduct occurred more than thirty days from his termination" ("Yet his termination occurred just two days after his request for FMLA."). *Id.* at 15–17.

In reply, the School repeats that Ms. Andrews (again, the sole decisionmaker) was unaware of Mr. Smith's leave inquiry at the time she made the termination decision (Filing No. 39 at 10). And even if she had known about the query, no evidence suggests retaliatory motive when Mr. Smith relies almost exclusively upon "suspicious timing." *Id.* (citing *Lutes v. United Trailers, Inc.*, 950 F.3d 359, 369 (7th Cir. 2020)). And despite his argument that "there is 'more' in this case," Ms. McCollum's recommendation letter does not suffice to establish that his termination was not rooted in fact; it merely speaks to his potential for future success. *Id.* at 11. Moreover, even before he asked about parental leave, the School and its leaders were concerned with Mr. Smith's performance and had taken away some of the core duties of his job due to his lack of content knowledge. *Id.* at 11–13.

The Court agrees with the School that summary judgment is warranted on the Title VII and ADA retaliation claims because Mr. Smith advanced no argument in response to the School's points (*see* Filing No. 39 at 9 ("Summary judgment is also warranted on second Count II of Plaintiff's Complaint – ADA retaliation. Again, Plaintiff advances no argument in his Response brief in support of this claim."), 14 ("The School is also entitled to judgment as a matter of law on Count VI of Plaintiff's Complaint – Title VII retaliation. Plaintiff advanced no argument on this claim in his Response brief."); *Goodpaster v. City of Indianapolis*, 736 F.3d 1060, 1075 (7th Cir. 2013) ("Because they did not provide the district court with any basis to decide their claims, and did not respond to the City's arguments, these claims are waived.")). And the Court can quickly resolve the FMLA retaliation claim: Because Ms. Andrews did not know about Mr. Smith asking about parental leave before deciding to terminate him, she could not have retaliated against him for any FMLA "request." *See Guzman*, 884 F.3d at 640 (7th Cir. 2018) ("*Peltier decided to fire Guzman* on March 8, 2013. It is also undisputed that, if Guzman informed Panure of the possibility

that she suffered from sleep apnea, *he did not relay that information to Peltier*. Accordingly, Guzman cannot establish a causal link between requests for FMLA leave on or after March 8, 2013, and her termination." (emphases added).) For the preceding reasons, the Court **grants** the School's Motion as it pertains to Mr. Smith's claims regarding retaliation.

**E.     Workers compensation retaliation claim**

Mr. Smith's Complaint alleges that the School retaliated against him for requesting workers compensation benefits, violating various provisions of Indiana law ([Filing No. 1 at 4](#)). Under Indiana law, claims for retaliatory discharge stemming from workers compensation claims are claims rooted in tort. *See Haas Carriage, Inc. v. Berna*, 651 N.E.2d 284, 289 (Ind. Ct. App. 1995). And under the Indiana Tort Claim Act, claims against political subdivisions are barred unless notice is given. Ind. Code § 34-13-3-8. Here, the School comprises a political subdivision as an arm of Indianapolis Public Schools through its so-called Innovation Network.  *See* Ind. Code § 20-25.7-4-5(b)(1) ("[T]he innovation network school is considered to be part of the school corporation."); *Lyons v. Richmond Cmty. Sch. Corp.*, 19 N.E.3d 254, 259 (Ind. 2014) (discussing notice provision under the Tort Claims Act applying to public schools). Moreover, not only does the Tort Claims Act apply to schools, but so do more-specific notice requirements. Under Indiana Code § 34-13-3.5-4, an

> individual . . . may not initiate a civil action . . . against a public school, unless the individual or entity submits a written notice to the public school and the governing body or the equivalent authority for a charter school that notifies the public school and the governing body or the equivalent authority for a charter school of the alleged violation of law and indicates a proposed remedy.

The School contends that claims against it for retaliation related to inquiries for workers compensation are foreclosed because Mr. Smith failed to provide the requisite notice complying either with the Tort Claim Act or Indiana Code § 34-13-3.5-4 ([Filing No. 28 at 27](#)–28).  In response, Mr. Smith contends that his EEOC Charge substantially complied with the requirements

by indicating it was based on "retaliation" and stating that "[a]t the end of January 2019, I informed HR that I was hurt on the job and that I needed some information on workers compensation." (Filing No. 33 at 23.)  In reply, the School argues that "the EEOC Charge was not filed with the School as required by the Indiana Tort Claim Act and, therefore, cannot constitute substantial compliance." (Filing No. 39 at 15 (citing *City of Indianapolis v. Buschman*, 988 N.E.2d 791, 794 (Ind. 2013) ("We generally will find substantial compliance where a notice is timely filed.")).) Still, the School concludes, Mr. Smith does not explain how he separately complied with Indiana Code § 34-13-3.5-4: "Even if the EEOC Charge could be construed as a Tort Claim Notice, it does not meet the statutory requirements of the school notice requirements – it does not include a proposed remedy (i.e. a specific request for relief)." *Id.* at 16.

The Court agrees with the School that Mr. Smith failed to provide the necessary statutory notice of this tort claim, which forecloses it from moving forward. Even if the EEOC Notice constituted notice under the Tort Claim Act (which is a shaky proposition considering it was not filed directly with the School), that document contained no "proposed remedy" as demanded by Indiana Code § 34-13-3.5-4 (*see* Filing No. 40-1). Because Mr. Smith did not properly apprise the school of the alleged violation of law and provide it with a proposed remedy before initiating this civil action, the Court **grants** the School's Motion as to his workers compensation retaliation claim.

## IV.   CONCLUSION

For the foregoing reasons, the Court **GRANTS** the School's Motion for Summary Judgment (Filing No. 27).  As this Entry resolves all claims in this case, Plaintiff Yuri Smith's claims are **DISMISSED** on summary judgment, the trial and final pretrial conference dates are hereby **VACATED**, and final judgment will issue under separate order.

**SO ORDERED.**

Date:  9/30/2021

Hon. Tanya Walton Pratt, Chief Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Amber K. Boyd
AMBER K. BOYD ATTORNEY AT LAW
amber@amberboydlaw.com

Sarah Elizabeth Larimer
AMBER BOYD LAW
sarah@amberboydlaw.com

Sara R. Blevins
LEWIS & KAPPES PC
sblevins@lewis-kappes.com